UNITED STATES, Appellant

v.

CHARLES A. BANCROFT, Private First Class,
U. S. Marine Corps, Appellee

3 USCMA 3, 11 CMR 3

No. 1139

Decided July 3, 1953

·CAPT Francis C. Foley, Jr., USMCR, for Appellant.
LT JG Robert Emmet Dunne, USN, for Appellee.
CAPT Wesley C. Blake, USMC, Amicus Curiae.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

This case is before us on certificate from The Judge Advocate General, United States Navy, requesting that we determine whether the special court-martial which convicted the accused had jurisdiction to hear the cause. The question becomes important for the reasons hereinafter set forth.

The accused was tried by special court-martial at Ichon-ni, Korea, on May 8, 1952, for sleeping on post, in violation of Article 113 of the Uniform Code of Military Justice, 50 USC § 707. He pleaded not guilty but was found guilty of the charge and specification and was sentenced to a bad-conduct discharge, forfeiture of $30.00 per month for six months and confinement for a like period of time. The convening authority reduced the confinement to three months and suspended the bad-conduct discharge during the period of confinement. The supervisory authority approved.

A board of review in the office of The Judge Advocate General of the Navy held that because the offense charged could be punished by death when committed in time of war and since the offense occurred in Korea during the present conflict, and the case was, therefore, capital, the special court-martial had no jurisdiction over the offense.

The Judge Advocate General of the Navy seeks a determination of the correctness of that decision. Accused joins in the Government's contention that the decision is incorrect in law while the converse is supported by briefs and argument of amicus curiae.

I

The offense for which accused was tried is proscribed by Article 113, Uniform Code of Military Justice, supra. That Article is as follows:

"Any sentinel or look-out who is found drunk or sleeping upon his

post, or leaves it before he is regularly relieved, *shall be punished, if the offense is committed in time of war, by death or such other punishment as a court-martial may direct,* but if the offense is committed at any other time, by such punishment other than death as a court-martial may direct." [Emphasis supplied.]

By virtue of Executive Order No. 10214, dated February 8, 1951, which promulgated the Manual for Courts-Martial, United States, 1951, the maximum punishment to be imposed for violation of that Article, except in time of war, was limited to a dishonorable discharge, total forfeitures and confinement for one year. However, the Manual specifically provides for automatic suspension of this maximum upon a declaration of war since paragraph 127c, page 217, thereof states:

"Immediately upon a declaration of war subsequent to the effective date of this manual, the prescribed limitations on punishment for violations of Articles 82, 85, 86, 87, 90, 113, and 115 automatically will be suspended and will not apply until the formal termination of such war or until restored by Executive order prior to such formal termination."

Apparently to supplement this automatic suspension and to remove the limits previously set by the Table of Maximum Punishments, The President on August 8, 1950, by Executive Order No. 10149, suspended the limitation upon the punishment for certain offenses when committed by persons who were within a specified area in the Far East, including Korea, and this suspension was extended by Executive Order No. 10247, dated May 29, 1951, to cover violations of the punitive Article herein involved.

Concededly, The President has the authority under Article 56 of the Code, 50 USC § 637, to lift the maximum sentence set by him for any offenses so long as he does not exceed the limits imposed by Congress. However, under the express language of Article 113, regardless of The President's action, punishment may not extend to the death penalty unless the offense is committed in time of war. While he has freed the punishment from executive limitations, a finding by us that the offense herein is capital or noncapital depends solely upon the nature of the operations now being carried on in Korea.

II

Although this Court has never categorically set out its views on the exact nature of the Korean conflict, we have for purposes of disposing of certain issues, where a state of war was conceded by all parties, accepted the concession. See United States v. Horner (No. 1031), 2 USCMA 478, 9 CMR 108, and United States v. Young (No. 1015), 2 USCMA 470, 9 CMR 100, both decided May 8, 1953. Concessions have not been made in this case and the issue is in sharp dispute. We must, therefore, dispose of the respective contentions. We believe a finding that this is a time of war, within the meaning of the language of the Code, is compelled by the very nature of the present conflict; the manner in which it is carried on; the movement to, and the presence of large numbers of American men and women on, the battlefields of Korea; the casualties involved; the sacrifices required; the drafting of recruits to maintain the large number of persons in the military service; the national emergency legislation enacted and being enacted; the executive orders promulgated; and the tremendous sums being expended for the express purpose of keeping our Army, Navy and Air Force in the Korean theatre of operations. For our purpose, it matters not whether the authorization for the military activities in Korea springs from Congressional declarations, United Nations Agreements or orders by the Chief Executive. Within the limited area in which the principles of military justice are operative, we need consider only whether the conditions facing this country are such as to permit us to conclude that we are in a state of war within the meaning of the terms as used by Congress. A reading of the daily newspaper accounts of the conflict in Korea; an appreciation of the size of the forces involved; a recognition of the efforts, both military and civilian, being ex-

5

pended to maintain the military operations in that area; and knowledge of other well-publicized wartime activities convinces us beyond any reasonable doubt that we are in a highly developed state of war. Moreover, we believe that battle conditions, where many lives depend upon the proper performance of hazardous duty by each and every individual, require that peacetime sentences with regard to military offenses be discarded and the more severe wartime sentences be invoked. It would indeed be an insult to the efforts of those servicemen who are daily risking their lives in defense of democratic principles to hold that peacetime conditions prevail. Conceding that other courts in certain civilian cases have held that a formal declaration of war is a condition precedent to a state of war, the reasons which are influential there are not persuasive here. For our purposes we need not get into the refinements of those cases which interpret the terms of a contract nor decide whether we are engaged in a de facto or de jure war. Practical considerations are more important. We cannot, of course, arrive at a decision contrary to the clear intent of Congress, but in view of the historical development of this phase of military law, previous impositions of wartime penalties during conflicts which were not clearly authorized by a Congressional declaration, the wording of the Code, and the interpretation Congress itself has placed on the hostilities by re-establishing certain wartime rights, cause us to believe that when The President, as Commander-in-Chief, ordered members of the armed services into the conflict, he involved this country in hostilities to such an extent that a state of war existed; and that Congress, when it used the phrase "in time of war" in the military Code, intended the phrase to apply to that state regardless of whether it was initiated or continued with or without a formal declaration.

Our conclusion in this regard is not without precedent and is not contrary to any view expressed by the United States Supreme Court in the recent case of Youngstown Sheet & Tube Co. v. Sawyer, 343 US 579, 96 L ed 1153, 72 S Ct 863. That case did not pass on issues similar to those facing us but other Federal cases have. Before dealing with them we consider it desirable to quote the following statement from Winthrop in his Military Law and Precedents, 2d ed., 1920 Reprint, at page 668:

"But a declaration of war by Congress is not absolutely necessary to the legal existence of a status of foreign war.[20] Such a war cannot indeed be declared or initiated by the President, but, if declared or commenced against us by another power, which, thereupon, before our Congress can or does act, proceeds to invade our territory, or to attack the defences of our coast or frontier, such invasion or attack must, under the orders of the Executive as Commander-in-chief, be met and resisted by force against force, and in this armed meeting and resistance there is war. Under such circumstances a legal status of foreign war would actually exist, and the jurisdiction created by the present Article would become operative, in the absence of, or rather prior to, any formal declaration or other action on the part of Congress."

"[20] Declarations of war or similar formal notices are held by modern writers on International Law not to be necessary to the initiation of a status belli. See Phillimore, vol 3, ch V; Hall, 321. And compare the interesting publication on 'Hostilities without Declaration of War,' by Lt. Col. Maurice, Royal Artillery, London, 1883."

If we were to rely on this early authority, we could say that the presence of American troops in the Far East, their purpose for being there, our commitments to the United Nations, the conflicting ideologies then existing, and the attack by the North Koreans and Communists were of sufficient importance that, when The President ordered the military services to resist the aggression and the advance of Communism, a legal status of foreign war existed for the purpose of applying the provisions of the Uniform Code of Military Justice, 50 USC §§ 551–736.

In Hamilton v. M'Claughry, 136 F 445 (CCD Kan), a determination of the nature of the Boxer Uprising in China, within the meaning of the 58th Article of War, 10 USC § 1530, which allowed trial by court-martial for certain offenses in time of war, was considered. The court in holding a state of war existed stated:

"By act of Congress the pay of the officers and men in the military service of this country during the time they were occupied in China was increased to the amount paid in time of actual war, notwithstanding the fact that during all the time of the military occupation of China by this and other foreign nations the government of China maintained with this and other foreign nations engaged in such occupation a footing of peace, and notwithstanding the further fact that at no time was there any declaration of war on the part of this government against the government of China. Yet I am constrained to hold that by reason of the occupation of Chinese territory by the large military force of this government, under authority of the Department of War, the many conflicts between the forces of this government and the armed Chinese troops, and the recognition of a condition of war by the Congress of the United States in making payment to the officers and men of this government there engaged on a war basis and all the other facts and circumstances in this case, at the time the homicide in question was committed there prevailed in China a condition of war, within the spirit and intent of the fifty-eighth article of war, for that this government was there asserting its right of protection over the citizens and accredited representatives of this government, and their property, by force of arms; that the essential and requisite jurisdictional facts authorizing a trial of petitioner by a general court-martial, under the provisions of the fifty-eighth article of war, did and must of necessity be held to have existed; and that the judgment of that court must be upheld and enforced, and the writ denied."

In the early case of The Eliza (Bas. v. Tingy) (1800), 4 US 37, 11 L ed 731, the United States Supreme Court had this to say about declared and undeclared war:

". . . . every contention by force between two nations, in external matters, under the authority of their respective governments, is not only war, but public war. If it be declared in form, it is called solemn, and is of the perfect kind . . . . [p 39]

"But hostilities may subsist between two nations, more confined in its nature and extent; being limited as to places, persons, and things; and this is more properly termed imperfect war; because not solemn, and because those who are authorized to commit hostilities act under special authority, and can go no further than to the extent of their commission. Still, however, it is public war, because it is an external contention by force, between some of the members of the two nations, authorized by the legitimate powers. It is a war between the two nations, though all the members are not authorized to commit hostilities such as in a solemn war, where the government restrains the general power." [p 40]

In the case of United States v. Gilbert, 9 BR–JC 183 (1950), the Judicial Council held that the present conflict in Korea was a war within the meaning of Article of War 75, 10 USC § 1547. That case was decided after enactment, but almost a year prior to the effective date, of the Uniform Code of Military Justice, and Congress has not seen fit to narrow the interpretation placed on the phrase "in time of war." It may well be that the holding was not called to the attention of Congress, but many individual members of the Senate and the House were well aware of it. The Judicial Council in that case used the following language (page 222):

"Even assuming, as contended by counsel, that a state of war is a prerequisite to the application of Article of War 75, we still conclude, for the reasons hereinafter set forth, that the Article was in full force and ef-

fect at the time and place of the accused's offense, notwithstanding the legislative termination of World War II on 25 July 1947 so far as Article of War 75 is concerned (61 Stat 449, ch 327, sec 3). The background, extent and nature of the hostilities between the United States and North Korean forces on 31 July 1950, and the inevitable results of such hostilities up to that time in terms of casualties, again matters of common knowledge and therefore proper subjects of judicial notice, are genuine proof of the existence of a state of public war between the two governments on that date."

In a more recent case, namely, CM 347025, Anderson, 1 CMR 345, a board of review in the office of The Judge Advocate General of the Army reached a similar conclusion. The board there stated:

"The Congress has seen fit in the present conflict to allow additional exclusions from gross income for purposes of computation of income tax by officers and enlisted personnel who serve as members of the armed forces of the United States 'in a combat zone after June 24, 1950 and prior to January 1, 1952.' (Section 202 (a) Revenue Act of 1950; Pub. Law 814, 81st Cong.; 26 USC 22 (b) (13).) Pursuant to this act the President, in Executive Order No. 10195, Dec 21, 1950, 15 Fed Reg 9177, designated Korea and the waters adjacent thereto within certain described limits 'as an area in which armed forces of the United States have engaged in combat.' See also New York Life Ins. Co. v. Bennion, 158 F2d 260, 264 (CCA 10th, 1946), cert denied 331 US 811, and Borchard, When Did the War Begin?, 47 Col L Rev 742–748, and authorities therein cited.

"In view of the above it is believed that a state of war existed in Korea on 29 January 1951 within the meaning of Article of War 58. . . . ."

Furthermore, in view of the recent case of United States v. Gann and Sommer (No 1425), 3 USCMA 12, 11 CMR 12, decided this date, we held the status

of the present conflict in Korea to be a state of war, we now find no good reason to reject these credible authorities and, therefore, conclude that the offense for which the accused was tried and convicted must be found to be a capital offense.

III

In approaching a consideration of the jurisdiction of the special court-martial over this particular offense, a few of the fundamental rules governing courts-martial should be mentioned. It has long been settled that they are of limited jurisdiction. No presumption in favor of their exercise of jurisdiction is permissible. To give effect to their findings and sentence it must be made to appear affirmatively that the court was legally constituted and that it had jurisdiction of the offense. Article 19, Uniform Code of Military Justice, 50 USC § 579, fixes the jurisdiction of special courts-martial. The part pertinent to the issue is as follows:

"Subject to article 17, special courts-martial shall have jurisdiction to try persons subject to this code for any noncapital offense made punishable by this code *and, under such regulations as the President may prescribe, for capital offenses. . . ."* [Emphasis supplied.]

It is discernible from the Article that by Congressional pronouncement, jurisdiction over capital cases does not vest in special courts-martial except in those cases where the regulations prescribed by The President so provide. The important regulations touching on this grant of power are found in paragraph 15 of the Manual for Courts-Martial, United States, 1951. It reads as follows:

"(1) Subject to the regulations prescribed in 13, special courts-martial have power to try any person subject to the code for any noncapital offense made punishable by the code, and, under such regulations as are provided in this paragraph, for capital offenses (Art. 19). *Although a capital offense for which there is*

*prescribed a mandatory punishment beyond the punitive power of a special court-martial may never be referred to such a court, an officer exercising general court-martial jurisdiction over the command which includes the accused may cause any other capital offense to be referred to a special court-martial for trial.* The Secretary of a Department may, by regulations, authorize officers exercising special court-martial jurisdiction to cause capital offenses, except those in violation of Articles 106 and 118 (1) and (4), to be tried by special court-martial without first obtaining the consent of the officer exercising general court-martial jurisdiction over the command.

*"(2) An offense is capital within the meaning of Article 19 when the maximum punishment which a general court-martial may adjudge therefor includes the death penalty. Subject to the exceptions noted in the following subparagraph, the offenses denounced in Articles 94, 99, 100, 102, 104, 110a, 118 (1) and (4), and 120a are capital at all times; those denounced by Articles 85, 90, 101, 106, and 113 are capital if committed in time of war.*

*"(3) Although capital under one of the articles cited, an offense is not capital if the applicable maximum limit of punishment prescribed by the President under Article 56 is less than death (127c); or, in any case in which the death penalty is not mandatory but is authorized by law whenever the authority competent to convene a court-martial for a capital case has directed that the case be treated as not capital pursuant to Article 49 (145a). . . . ."* [Emphasis supplied.]

Under the terms of the quoted regulation, the only offenses over which a special court-martial may ■ not, under any circumstances, assume jurisdiction are those in which the death penalty is mandatory, namely, spying under Article 106, 50 USC § 700, and certain types of premeditated murder under Article 118, 50 USC § 712. All other offenses are triable either by special or general courts-martial, but the jurisdiction of the former can only be invoked in nonmandatory capital cases when the prescribed requirements have been fully complied with.

The same regulation grants jurisdiction to special courts-martial to try all but mandatory, death or life imprisonment cases if the officer exercising general court-martial jurisdiction over the command which includes the accused has caused the case to be referred to such court for trial, or, if the Secretary of a Department has authorized the officer exercising special court-martial jurisdiction to refer the case to a special court-martial. It likewise provides that the offense may be treated as noncapital when the "authority competent to convene a court-martial for a capital case has directed that the case be treated as not capital pursuant to Article 49."

In the instant case it is ■ admitted that none of the required initiatory steps were complied with as the court-martial was convened by order of accused's commanding officer, whose authority extended only to special court-martial jurisdiction and the Secretary of the Navy had not authorized him to take such action. Moreover, the record reveals no other affirmative act on the part of the officer exercising general court-martial jurisdiction or the Secretary of the Navy, which would vest jurisdiction in the special court-martial. Accordingly, the court's assumption and exercise of jurisdiction over the offense cannot be supported and its proceedings are void unless some post trial action can revert back and confer jurisdiction.

## IV

Before discussing the effect of any post trial action we dispose of the contention that the lack of ■ jurisdiction was cured by accused's failure to object to trial by the special court-martial. In spite of the fact that to escape the effect of the board of review decision both parties seek to have us accept the contention, it does not find support in the law. The general rule is stated in 14 American Jurisprudence, Criminal

Law, section 214, at page 917, as follows:

> "In order that a crime may be prosecuted and judgment given, it is necessary that the trial court have jurisdiction of the subject matter—that is, the offense—and of the person of the defendant. Jurisdiction of the subject matter is derived from the law. It can never be acquired solely by consent of the accused. . . ."

This military rule is reflected in paragraph 68b, Manual for Courts-Martial, United States, 1951, which is as follows:

> "If the court lacks jurisdiction or if the charges fail to allege any offense under the code the proceedings are a nullity. . . ."

We are well aware of the accused's desire to claim the benefits of the present finding and sentence and there is some justification for his assertion that he should not again be tried for this offense. This is, of course, a matter which should be given serious consideration by the proper Naval and Marine Corps commanders at the appropriate time, but we cannot create jurisdiction when none, in fact or law, exists. The language of the Manual is clear and unequivocal. The considerations upon which it is based rest in sound policy. Congress concluded there were good reasons for the prohibition on special courts and while we cannot point out precisely the reasons for the conclusion, this is neither necessary nor important. However, one suggests itself. A conviction for any offense of sufficient gravity to permit the imposition of a death sentence, even though a light sentence must be imposed by the court, places a stigma on an accused which ought not to be permitted without those protective features which identify trial by a general court-martial under the Code, including the increased number of members on the court and legally trained counsel to defend the accused. But aside from that, fundamental concepts and legislative enactments upon which jurisdiction is founded cannot be warped, to escape what may be merely an imaginary hardship.

## V

Counsel for the parties earnestly argue that since the case was tried by a court-martial which lacked ▪ jurisdiction only because of procedural defects, the infirmities have been cured by subsequent action. The first argument is that when the case was referred to a special court it automatically became noncapital because that court was limited as to sentence and, therefore, the jurisdiction by the special court was proper. That argument is specious for two reasons. First, the Manual specifically provides otherwise. Second, the law long has been to the contrary. The action taken by the court-martial cannot supply a missing requirement and two unauthorized acts cannot add up to one legal act. The argument might have more merit if the officer referring the case to the court had the power of reference or the authority to declare a case noncapital. But one not authorized to confer jurisdiction on a court cannot assume the power and then have his assumption of authority defended on the theory that the court by acting validated his unauthorized act.

A case involving a somewhat similar issue was passed on by the Circuit Court of Appeals, First Circuit, in 1945. In Rosborough v. Rossell, 150 F2d 809, the facts were these: The accused, an enlisted man in the United States Navy, was on detached duty as an armed guard on board an oil tanker registered in, and flying the flag of, the Republic of Panama. At the time of the offense the tanker was moored at dock in Montevideo, Uruguay. The accused, who was intoxicated, began firing the machine gun on the bridge and one of the bullets struck and killed the chief officer of the tanker, a civilian. After being arrested by local police he was released to the custody of the United States Navy and was subsequently tried by court-martial upon the charge of murder. In granting a writ of habeas corpus, the Circuit Court of Appeals held that under the Articles for the Government of the Navy, 34 USC § 1200, the court-martial lacked jurisdiction to try the accused for murder

since the offense was committed without the territorial limits of the United States and at a time when the accused was not serving on a public vessel of this country. In that case the court-martial returned a finding of guilty of manslaughter, which offense it did have jurisdiction to try. The contention was advanced that the jurisdictional defect was cured by the result of the trial. The Circuit Court of Appeals stated:

"But if, as we have ruled here, the court-martial did not have jurisdiction of the charge upon which Rosborough was brought to trial, we think, contrary to respondent's contention, that the whole case was coram non judice and that the jurisdictional defect was not cured by the subsequent judgment of the court-martial convicting Rosborough of manslaughter only. . . .

"Rosborough might have been brought to trial on a charge of murder and specification thereunder and a separate charge of manslaughter and specification thereunder. In such a case a court-martial would have no jurisdiction of the murder charge, but that would not have rendered the proceedings wholly void, since it would have had jurisdiction of the charge of manslaughter; hence, a finding of guilty of manslaughter only and sentence therefor would have been valid. But Rosborough was charged only with murder, and, when he objected at the outset to the jurisdiction, the court-martial should have ruled, in the view we take, that it had no jurisdiction to proceed to try the charge. It could not legally have taken the position, at that point, that though it had no jurisdiction to try Rosborough for murder, it would proceed to try him for manslaughter, because a court-martial has authority to try a man only on the charge or charges laid by the convening authority. In addition to that, the court-martial, when met by Rosborough's objection to its jurisdiction, did not proceed to try him for manslaughter; it tried him for murder, which it had no jurisdiction to do."

In the instant case, it is certain that at the time of trial the court-martial could not have legally convicted the accused because he was being tried for a capital offense contrary to the express provisions of the Code. The findings and sentence were not voidable. They were void and the accused could have successfully attacked them in a collateral proceeding. If this is correct, neither the fact that he was sentenced to less than life nor the stamp of approval by the officer exercising general court-martial authority would cure the defect. He could still assail the conviction because when a criminal action is tried before a court which does not have jurisdiction, the entire proceedings are a nullity. An order entered by general court-martial authority antedated before trial could not breathe life into the proceedings as jurisdiction of the offense must be acquired before trial and not afterwards. To hold otherwise would destroy the rights of many in a vain hope of protecting the rights of one.

The decision of the board of review is affirmed.

Chief Judge QUINN and Judge BROSMAN concur.