UNITED STATES, Appellee

v

CLAYTON ANDERSON, Specialist Four,
U. S. Army, Appellant

17 USCMA 588, 38 CMR 386

No. 20,775

June 21, 1968

Captain Douglas J. Wold argued the cause for Appellant, Accused. With him on the brief were Colonel Daniel T. Ghent, Major Jack G. McKay, and Captain John Wall Hanft.

Captain Harvey L. Anderson argued the cause for Appellee, United States. With him on the brief were Lieutenant Colonel David Rarick, Major Edwin P. Wasinger, and Major John F. Webb, Jr.

## Opinion

QUINN, Chief Judge:

On November 3, 1964, the accused, who had more than fourteen years of honorable service, absented himself without authority from his unit at Fort Polk, Louisiana. On February 10, 1967, he surrendered to civilian authorities and was returned to military control at Fort Campbell, Kentucky. In due course, he was charged with desertion, in violation of Article 85, Uniform Code of Military Justice, 10 USC § 885, and convicted of that of-

fense by a general court-martial at Fort Campbell.

When the record of trial was reviewed by the board of review, it concluded the Government had not proved that the accused had intended to remain away permanently. It, therefore, affirmed findings of guilty of only the lesser offense of unauthorized absence, in violation of Article 86, Code, supra, 10 USC § 886. The board of review then considered the effect of the statute of limitations and determined that

**588**

the offense was committed "in time of war," within the meaning of Article 43, Code, supra, 10 USC § 843, and the accused could thus be tried and punished "at any time without limitation." Appellate defense counsel contend this determination is erroneous, and the accused's conviction of the lesser offense is barred by the two-year period of limitation prescribed in subsection (c) of Article 43.[1]

The current military involvement of the United States in Vietnam undoubtedly constitutes a "time of war" in that area, within the meaning of Article 43's suspension of the running of the statute of limitations. United States v Bancroft, 3 USCMA 3, 11 CMR 3; cf. United States v Shell, 7 USCMA 646, 23 CMR 110. The question presented by this appeal is the nature of the military commitment in Vietnam as of November 3, 1964, the date of the commission of the offense of which the accused stands convicted.

Reviewing the history of the military position of the United States in Vietnam, the board of review held that the Southeast Asia or Gulf of Tonkin resolution by Congress on August 10, 1964,[2] constituted "official recognition" that the United States was engaged in an "overt confrontation of arms between opposing powers." On the authority of United States v Ayers, 4 USCMA 220, 227, 15 CMR 220, it also held that Article 43 applied to "unauthorized absences originating within the United States." Appellate defense counsel, however, construe the Gulf of Tonkin resolution not as a determination that the United States is in a state of war, but as a "legal redundancy" reiterating the responsibilities of this country under the Southeast Asia Collective Defense Treaty, 6 UST 81, TIAS 3170, September 8, 1954.

Appellate defense counsel indicate, in their admirable brief, that not every instance in which a military contingent of another power engaged in combat with an American force resulted in a time of war. However, it does not follow, as they contend, that the attack by North Vietnamese forces on the United States destroyers MADDOX and C. TURNER JOY in the Gulf of Tonkin was "an isolated incident" of insufficient proportions to transform the United States military position in Vietnam into a time of war. The United States affirmatively responded to the attack. Appellate defense counsel concede as much. Relying upon Ambassador Adlai Stevenson's statement to the United Nations Security Council explaining the United States decision "to take positive but limited relevant measures" to secure itself against "further aggression" (Senate Report No. 1329, 88th Congress, 2d Session, page 6), they describe the United States response as "defensive"; and they contrast this response with the "offensive" actions taken on and after February 7, 1965, when United States forces were attacked in the Plieku area. In their view, the February 7th attacks are the earliest hostilities sufficient to constitute a time of war. In my opinion, the exact proportions of the Gulf of Tonkin attack are not material. Nor is the nature of the United States response as "defensive"

[1] In pertinent part, Article 43, Uniform Code of Military Justice, 10 USC § 843, provides as follows:

"(a) A person charged with desertion or absence without leave in time of war, or with aiding the enemy, mutiny, or murder, may be tried and punished at any time without limitation.

"(b) Except as otherwise provided in this article, a person charged with desertion in time of peace . . . is not liable to be tried by court-martial if the offense was committed more than three years before . . . [receipt of sworn charges by an appropriate officer].

"(c) Except as otherwise provided in this article, a person charged with any offense is not liable to be tried by court-martial . . . if the offense was committed more than two years before . . . [receipt of sworn charges by an appropriate officer]."

[2] Joint Resolution to promote the maintenance of international peace and security in Southeast Asia. Public Law 88–408, 88th Congress, 2d Session, 78 Stat 384, August 10, 1964.

or "offensive" relevant. The very documents relied upon by appellate defense counsel demonstrate that the Executive Branch of the Government regarded the resolution as the keystone of United States relations with North Vietnam. The Department of Defense Annual Report discussing the February 7th attacks described the United States response to North Vietnam's "more aggressive course of action" against United States and South Vietnam installations as a decision to take *"additional* forceful measures." (Emphasis supplied.) Department of Defense Annual Report, Fiscal Year 1965, at pages 5–7. The report plainly indicates that these attacks by North Vietnam forces enlarged the area and the intensity of the military hostilities, but they did not establish a new jural relationship between North Vietnam and the United States different from that created by the Gulf of Tonkin attack and the United States response. Perhaps the best indication of the interpretation by the Executive Branch of the Gulf of Tonkin resolution is the testimony of Under Secretary of State, Nicholas deB. Katzenbach, before the Senate Foreign Relations Committee in 1967. He testified that the Administration regarded the resolution as participation by Congress "in the functional way . . . contemplated by the Founding Fathers" to "invoke the . . . war powers." Hearings on S Res 151, relating to United States Commitments to Foreign Powers, Senate Foreign Relations Committee, 90th Congress, 1st Session, at pages 161–162.

The Administration is not always correct in interpreting the will of the Legislature. Appellate defense counsel point out that several members of the Senate have indicated they did not understand the Tonkin Gulf resolution to constitute a declaration of war within the meaning of the Constitution. Hearings, Senate Foreign Relations Committee, supra, at pages 118–132; see also Hearing, Senate Foreign Relations Committee, The Gulf of Tonkin, The 1964 Incidents, 90th Congress, 2d Session, at page 81. These comments may be entitled to respectful considera-

tion, but they do not necessarily indicate the purpose or intent of Congress in enacting the resolution as a statement of the political relationship between the United States and North Vietnam. See United States v Wise, 370 US 405, 411, 8 L Ed 2d 590, 82 S Ct 1354 (1962).

The resolution is clearly more than a reminder of the existence of obligations under treaties relating to Southeast Asia. It describes the attack on United States Naval Forces in Tonkin Gulf as a violation of international law, and it specifically commits the United States "to take all necessary steps," including the use of armed force, to repel aggression and to assure peace in Southeast Asia. It contemplates use of the armed forces for an uncertain period of time. Thus, it directs that its provisions remain in force until either the President declares that "the peace and security of the area" are assured, or Congress terminates them earlier by "concurrent resolution." The language of the resolution clearly indicates that Congress also recognized and declared, as a legislative decision, that the Gulf of Tonkin attack precipitated a state of armed conflict between the United States and North Vietnam. Cf. dissenting opinion of Chief Judge Quinn in United States v Ayers, supra; see Hirabayashi v United States, 320 US 81, 93, 87 L Ed 1774, 63 S Ct 1375 (1943).

When a state of hostilities is expressly recognized by both Congress and the President, it is incumbent upon the judiciary to accept the consequences that attach to such recognition. See Bas v Tingy, 4 Dallas 37, 40 (US 1800). I conclude, therefore, that at the time of the accused's unauthorized absence the United States was "in time of war," within the meaning of Article 43 of the Uniform Code. Thus, the board of review correctly determined that the statute of limitations had not run against the offense.

The decision of the board of review is affirmed.

KILDAY, Judge (concurring):

The United States Constitution, Ar-

ticle I, section 8, clause 11, vests in Congress the power "to declare War."

Similarly, Article II, section 2, thereof designates the President as "Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States."

The issue of whether a "time of war" or "state of war" existed at any particular time is not dependent solely upon action by Congress. By their very nature, the power of Congress to declare war and the power of the President as Commander in Chief become very closely entwined. Indeed, William Howard Taft once said:

> "The President is the commander-in-chief of the army and navy, and of the militia when called into the service of the United States. Under this he can order the army and navy anywhere he will. Of course the instrumentality which it furnishes gives the President an opportunity to do things which involve consequences that it would be quite beyond his power under the Constitution directly to effect. Under the Constitution Congress has the power to declare war, but with the army and navy the President can take action such as to involve the country in war and to leave Congress no option but to declare it or to recognize its existence. Indeed, war as a legal fact, it was decided by the Supreme Court in the prize cases, could exist by invasion of a foreign enemy, or by such an insurrection as occurred during the Civil War, without any declaration of war by Congress at all, and it was only in the case of a war of aggression that the power of Congress must be affirmatively asserted to establish its legal existence."[1]

A review of the 179 years since the adoption of the Constitution will show rare indeed have been the occasions upon which Congress alone has declared war. As a matter of fact, Congress has never in its history declared war except as a consequence of the President's acts or recommendations. It has never refused a request from the President that war be declared.

On five occasions this Nation has participated in formally declared wars. However, in four of those instances, the declarations of war recognized the prior existence of war. The fifth, being the War of 1812, stated, "war be and the same is hereby declared to exist." 2 Stat 755.

On May 13, 1846, Congress declared: "Whereas, by act of the Republic of Mexico, a state of war exists." 9 Stat 9. As to the Spanish-American War, Congress, on April 25, 1898, provided: "That war be, and the same is hereby, declared to exist, and that war has existed since the twenty-first day of April . . . between the United States of America and the Kingdom of Spain." 30 Stat 364. The First World War was declared to exist by the declaration of war on April 6, 1917, which provided, "That the state of war between the United States and the Imperial German Government which has been thrust upon the United States is hereby formally declared." 40 Stat 1. The day after the Japanese attack on Pearl Harbor, Congress, on December 8, 1941, declared: "Whereas the Imperial Government of Japan has committed unprovoked acts of war against the Government and the people of the United States of America: Therefore be it *Resolved* . . . That the state of war between the United States and the Imperial Government of Japan which has thus been thrust upon the United States is hereby formally declared." 55 Stat 795. The action of the German Government caused the language of the declaration of war against her, on December 11, 1941, to read: "Whereas the Government of Germany has formally declared war against the Government and the people of the United States of America: Therefore be it *Resolved* . . . That the state of war between the United

---

[1] The Presidency: Its Duties, Its Powers, Its Opportunities, and Its Limitations, University of Virginia, Barbour-Page Foundation Lectures, January 1915.

States and the Government of Germany which has thus been thrust upon the United States is hereby formally declared." 55 Stat 796. On the same day, Congress declared war against Italy in the same language. 55 Stat 797.

Turning now to the occasions upon which the United States has engaged in serious and extended campaigns or uses of force against other nations without a declaration of war, we find that very early in our national life such campaigns became necessary. While we had previously engaged in the undeclared naval war with France during 1798 and 1800, the best known early action of this character was Thomas Jefferson's move against the Barbary Pirates. Even though the Bey of Tripoli declared war on the United States in 1801, and a bitter debate ensued as to the necessity for Congress to declare war, no declaration was made. Jefferson dispatched a squadron of frigates to the Mediterranean, but its mission was limited strictly to defense and the protection of commerce. Even though this debate had such great authorities as Jefferson and Hamilton on opposing sides, Congress took the position that a declaration of war was not necessary. It did actually pass a statute authorizing the President to instruct the commanders of our armed vessels to "seize and make prize of all vessels, goods and effects, belonging to the Bey of Tripoli . . . and also to cause to be done all such other acts of precaution or hostility as the state of war will justify." 2 Stat 129, 130.

In the intervening period there have been many instances of the use of the Armed Forces by the Commander in Chief. I mention such instances as the second Barbary War, 1815; the American-Mexican incidents between 1914 and 1917; the Boxer Uprising in 1900 and 1901; the almost innumerable instances of intervention in Latin America, Haiti, the Dominican Republic, and Nicaragua. We should not ignore the almost providential presence of our Army in the area which became the Panama Canal Zone, "to protect the American-owned Panama Railroad," when Panama was engaged in the revolution which established her independence, to be followed so quickly by President Theodore Roosevelt's recognition of the new republic and equally quickly by the treaty for the construction of the Panama Canal.[2]

That some of these engagements constituted a time of war as commonly understood and within the meaning of Article 43(a), Uniform Code of Military Justice, 10 USC § 843, there can be little doubt.

Regarding our early difficulties with France and whether or not there existed at that time a state of war between the two sovereignties, Justice Washington wrote in Bas v Tingy, 4 Dallas 37, 40–41 (US 1800):

". . . It may, I believe, be safely laid down, that every contention by force between two nations, in external matters, under the authority of their respective governments, is not only war, but public war. If it be declared in form, it is called solemn, and is of the perfect kind; because one whole nation is at war with another whole nation; and all the members of the nation declaring war, are authorized to commit hostilities against all the members of the other, in every place, and under every circumstance. In such a war all the members act under a general authority, and all the rights and consequences of war attach to their condition.

"But hostilities may subsist between two nations, more confined in its nature and extent; being limited as to places, persons, and things; and this is more properly termed imperfect war; because not solemn, and because those who are authorized to commit hostilities, act under special

---

[2] See, "The Office of the Legislative Branch in the Formulation of National Security Policy," an address at the National War College, Washington, D. C., on February 24, 1955, by Paul J. Kilday, as inserted in the Congressional Record (Appendix), February 24, 1955, 84th Congress, 1st Session.

592

authority, and can go farther than to the extent of their commission. Still, however, it is a public war, because it is an external contention by force between some of the members of the two nations, authorized by the legitimate powers. It is a war between the two nations, though all the members are not authorized to commit hostilities such as in a solemn war, where the government restrains the general power."

In a later day, military events and congressional action, absent a formal declaration of war, were sufficient to bring about the judicial determination that the "Boxer Uprising" was, in fact, "time of war." In Hamilton v McClaughry, 136 Fed 445 (D Kan) (1905), that court thus sustained the legality of a court-martial convened to try a soldier accused of murder while serving in the armed forces sent to China in 1900 to suppress the Boxer Rebellion. General court-martial jurisdiction, under the particular Article of War involved, depended upon the existence of a "time of war."

The courts have recognized the fact that war actually existed from the moment the Japanese attacked Pearl Harbor and that legally it was not necessary to wait for the formal declaration, the language being: "We can discern no demonstrable difference in the supposition and the actual facts, and we therefore conclude that the formal declaration by the Congress on December 8th was not an essential prerequisite to a political determination of the existence of a state of war commencing with the attack on Pearl Harbor." New York Life Insurance Co. v Bennion, 158 F2d 260, 264 (CA 10th Cir) (1946).

This same opinion contains the additional appropriate quote:

"When one sovereign nation attacks another with premeditated and deliberate intent to wage war against it, and that nation resists the attacks with all the force at its command, we have war in the grim sense of reality. It is war in the only sense that men know and understand it. Mankind goes no further in his definitive search—he does not stand on ceremony or wait for technical niceties. To say that courts must shut their eyes to realities and wait for formalities, is to cut off the power to reason with concrete facts. We cannot believe that the courts are deprived of the power to deal with this vital question in a practical and realistic sense." [Id., at page 264.]

Our views on the Korean conflict, recognized as a time of war, are adequately set forth in United States v Bancroft, 3 USCMA 3, 11 CMR 3; United States v Ayers, 4 USCMA 220, 15 CMR 220; and United States v Shell, 7 USCMA 646, 23 CMR 110. Suffice it to say, we observed in United States v Bancroft, supra, at page 6:

". . . We cannot, of course, arrive at a decision contrary to the clear intent of Congress, but in view of the historical development of this phase of military law, previous impositions of wartime penalties during conflicts which were not clearly authorized by a Congressional declaration, the wording of the Code, and the interpretation Congress itself has placed on the hostilities by re-establishing certain wartime rights, cause us to believe that when The President, as Commander-in-Chief, ordered members of the armed services into the conflict, he involved this country in hostilities to such an extent that a state of war existed; and that Congress, when it used the phrase 'in time of war' in the military Code, intended the phrase to apply to that state regardless of whether it was initiated or continued with or without a formal declaration."

Abundant authority exists, therefore, to make clear the fact that a condition of war between states may exist without there being a formal declaration of war. For obvious reasons, some judicially noted in United States v Howe, 17 USCMA 165, 37 CMR 429, this has, to my mind, been the posture of United States-North Vietnamese relations during the period of time in question.

I do not, however, agree that the Gulf of Tonkin resolution amounts to

or constitutes a declaration of war. I believe that Chief Judge Quinn so holds. To the contrary, in my view, it is akin to the act of February 2, 1802 (2 Stat 129), wherein the 7th Congress directed the President to use against the Regency of Tripoli such armed force as might be necessary to protect American commerce and seamen. It reflects the resolve of Congress, following the call of the President, "to join in affirming the national determination that all such attacks will be met, and that the United States will continue in its basic policy of assisting the free nations of the area to defend their freedom."[3]

It is, in essence, a congressional appraisal of world happenings, a recognition of events that, when considered with other equal compelling facts, leads to the necessary conclusion a state of war exists. Cf. Latney v Rusk (DC DC), January 15, 1968. I, therefore, disassociate myself from that portion in Chief Judge Quinn's opinion which is in contradiction to this conclusion. For other reasons contained in his opinion and for reasons here set forth, I concur.

FERGUSON, Judge (concurring in the result):

I concur in the result.

I am in full accord with Judge Kilday's views, except with respect to the effect which he gives to the so-called Gulf of Tonkin resolution, 78 Stat 384. In my opinion, it is unnecessary to consider the resolution or to characterize it either as a declaration of war—as does the Chief Judge—or as evidence of the existence of conflict, as does my brother Kilday. Regardless of the resolution, the fact remains that we are at war, even though it has not been solemnly declared in the Constitutional sense. Cf. Bas v Tingy, 4 Dallas 37 (US 1800).

Thus in United States v Howe, 17 USCMA 165, 37 CMR 429, we noted the existence of our involvement in overseas hostilities. We there stated, at page 173:

". . . We do judicially know that hundreds of thousands of members of our military forces are committed to combat in Vietnam, casualties among our forces are heavy, and thousands are being recruited, or drafted, into our armed forces."

These facts establish the existence of war in Vietnam. Compare United States v Bancroft, 3 USCMA 3, 11 CMR 3. To them, we might add our knowledge of the continuing casualties among American forces in that country and the expenditure on their efforts of two billion dollars per month.

That we are and were at war at the time of the absence without leave cannot be disputed. Such is true quite without reference to the Gulf of Tonkin resolution, supra. In consequence, I join my brothers in affirming the board of review, but disassociate myself from their various constructions of that document.

---

[3] The Situation in Southeast Asia, Message from the President of the United States, House Document No. 333, 110 Congressional Record, August 5, 1964, 88th Congress, 2d Session, page 18237.