**UNITED STATES**

v.

**Roland C. CASTILLO, 555 31 8254, Hospital Corpsman Second Class (E–5), U.S. Navy.**

**NMCM No. 91 2023.**

U.S. Navy–Marine Corps Court of Military Review.

Sentence Adjudged 26 Jan. 1991.

Decided 15 April 1992.

Maj. G.S. Warner, USMC, Appellate Defense Counsel.

LCDR G.H. Casey, JAGC, USNR–R, Appellate Defense Counsel.

LCDR Lawrence W. Muschamp, JAGC, USN, Appellate Government Counsel.

Before FREYER, Senior Judge, and HOLDER and MOLLISON, JJ.

MOLLISON, Judge:

Consistent with his pleas, the appellant was found guilty of one specification of willfully disobeying a superior commissioned officer in violation of Article 90, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 890. A military judge sitting as a special court-martial sentenced the appellant to confinement for five months, forfeiture of $450.00 pay per month for a period of five months, reduction to pay grade E–1, and a bad-conduct discharge. The convening authority approved the sentence as adjudged, but suspended all unexecuted confinement and forfeitures in excess of $250.00 pay per month for five months.[1] The appellant asserts six errors were committed in connection with his court-martial.[2] Most significantly, he contends that the special court-martial that tried him lacked jurisdiction because his offense was a capital offense at the time and no general court-martial convening authority had consented to his trial by special court-martial. The appellant urges the Court to set aside and dismiss the findings and sentence.

On 20 January 1991, the appellant was assigned to the 3rd Tank Battalion, 1st Marine Division (Reinforced), Fleet Marine Force, then located in Saudi Arabia. The appellant was assigned as the Battalion's Preventive Medicine Technician. The Officer-in-Charge of the Battalion Aid Station, appellant's superior commissioned officer, had a requirement to replace a corpsman in Company "A." He selected the appellant. The appellant willfully refused his order to report and serve in that capacity. Accordingly, the charge and specification alleging willful disobedience of this order were referred to trial by special court-martial by the Commanding Officer, 3rd Tank Battal-

---

1. Since then the Naval Clemency and Parole Board, acting for the Secretary of the Navy, suspended the appellant's bad-conduct discharge. NC & PB ltr 401.1, Ser N50SNCG–91 of 12 Nov 1991.

2. I. APPELLANT'S SPECIAL COURT–MARTIAL LACKED JURISDICTION TO TRY APPELLANT FOR AN ALLEGED VIOLATION OF ARTICLE 90, UNIFORM CODE OF MILITARY JUSTICE, A CAPITAL OFFENSE IN TIME OF WAR.
II. THE CONVENING AUTHORITY HAS FAILED TO HONOR THE TERMS OF THE PRETRIAL AGREEMENT.
III. THE CONVENING AUTHORITY TOOK ACTION WITHOUT COMPLETE CONSIDERATION OF REQUIRED CLEMENCY MATTERS.
IV. THE STAFF JUDGE ADVOCATE FAILED TO PROPERLY ADVISE THE CONVENING AUTHORITY REGARDING APPELLANT'S SERVICE RECORD AND OTHER POST–TRIAL MATTERS.
V. APPELLANT HAS BEEN DENIED EFFECTIVE REPRESENTATION.
VI. APPELLANT'S PLEAS ARE NOT PROVIDENT WHEN INDUCED BY A *SUB ROSA* AGREEMENT TO NOT SUBMIT FAVORABLE EVIDENCE OF APPELLANT'S HONORABLE AND OUTSTANDING RECORD, ACCUMULATED OVER SEVEN YEARS OF SERVICE, DURING THE PRESENTENCING PROCEEDINGS.

ion. That officer is a special court-martial convening authority, not a general court-martial convening authority. Articles 22(a), 23(a)(5), (7), UCMJ, 10 U.S.C. §§ 822(a), 823(a)(5), (7); JAG Instruction 5800.7C of 3 October 1990, Manual of the Judge Advocate General of the Navy (JAG-MAN) § 0120. There is no evidence in the record that a general court-martial convening authority consented to the referral of this charge to a special court-martial. At the time of the offense and the trial, hostilities were underway in the Persian Gulf region. Mil.R.Evid. 201.

Article 19, UCMJ, 10 U.S.C. § 819, provides: "[S]pecial courts-martial have jurisdiction to try persons subject to [the Code] for any non-capital offense made punishable by [the Code] and, under such regulations as the President may prescribe, for capital offenses." Pursuant to this provision of the Code and others,[3] the President and the Secretary of the Navy have promulgated pertinent regulations. As a consequence, a special court-martial lacks jurisdiction to try a capital offense without the concurrence of the appropriate general court-martial convening authority.[4] Rules for Courts–Martial (R.C.M.) 103(3), 201(f)(2)(C), Manual for Courts–Martial (MCM), United States, 1984; JAGMAN § 122a(2). The Code provides that a violation of Article 90 is punishable by death "in time of war." Otherwise, it carries a maximum authorized punishment of a dishonorable discharge, total forfeitures and confinement for 5 years. Articles 56, 90, UCMJ, 10 U.S.C. §§ 856, 890; MCM, Part IV, ¶ 14e.

■ The appellant contends that his offense occurred "in time of war," that the offense was a capital offense, and that, since no officer exercising general court-martial convening authority consented to his trial by special court-martial on this offense, the special court-martial before which he was tried and sentenced lacked jurisdiction. Assuming the accuracy of the

appellant's premise—that his offense was a capital offense because it was committed "in time of war"—the appellant would appear to be entirely correct. *United States v. Bancroft,* 3 U.S.C.M.A. 3, 11 C.M.R. 3 (1953); *United States v. Sykes,* 32 M.J. 791 (N.M.C.M.R.1990). Moreover, it appears that an error of this nature is jurisdictional, that the appellant did not waive the error by failing to object at trial, that reference of the charge to trial by special court-martial cannot now be retroactively ratified by a general court-martial convening authority, and that the error cannot be cured by affirming the non-capital, lesser offense of failing to obey a lawful order in violation of Article 92, UCMJ. *Bancroft;* 10 U.S.C. § 892; R.C.M. 907. Therefore, two questions are presented. Did the 1991 Persian Gulf conflict qualify as "time of war" within the meaning of the Code? If so, was capital punishment in fact authorized for Article 90 violations occurring during that conflict? We answer the first in the affirmative and the second in the negative. We, therefore, conclude the appellant's special court-martial had jurisdiction to try him without the concurrence of a general court-martial convening authority. Discussion follows.

■ The term "in time of war" appears in various articles of the Code. Article 2(a)(10), UCMJ, 10 U.S.C. § 802(a)(10) (jurisdiction over persons serving or accompanying an armed force in the field in time of war); Article 43(a), (e), (f), UCMJ, 10 U.S.C. § 843(a), (e), (f) (suspension of the statute of limitations in time of war); Article 71(b), UCMJ, 10 U.S.C. § 871(b) (commutation of a dismissal to reduction to any enlisted grade in time of war); *e.g.,* Article 90, UCMJ, 10 U.S.C. § 890 (capital punishment for willfully disobeying a superior commissioned officer in time of war). The Code, however, does not define the term and its legislative history is not particularly enlightening. *Analysis,* R.C.M. 103(19), App. 21, MCM, 1984, A21–5. Accordingly, defin-

---

**3.** Article 36, UCMJ, 10 U.S.C. § 836.

**4.** A capital offense that has a mandatory sentence beyond the punitive power of a special court-martial may never be referred to trial by

special court-martial. Rule for Courts–Martial (R.C.M.) 201(f)(2)(C), Manual for Courts–Martial, United States, 1984.

ing the term "in time of war" has been a matter of statutory construction by military courts.

Two tests have been adopted to determine whether a conflict is "in time of war" for purposes of the Code: a conflict is "in time of war" if Congress formally declares war (*de jure* war test) or if the conflict is a war in fact (*de facto* war test). *Cf. United States v. Gann,* 3 U.S.C.M.A. 12, 11 C.M.R. 12, 13 (1953); *Bancroft.* The *de jure* test is always a valid test for these purposes, however, the *de facto* test is not always sufficient. *Compare United States v. Averette,* 19 U.S.C.M.A. 363, 41 C.M.R. 363 (1970) (no jurisdiction to try civilians accompanying the armed forces in Vietnam under Article 2(a)(10), UCMJ, 10 U.S.C. § 802(a)(10) in absence of formal declaration of war by Congress), *with United States v. Anderson,* 17 U.S.C.M.A. 588, 38 C.M.R. 386 (1968) (Vietnam conflict was "time of war" and the Article 43 statute of limitations was therefore suspended). However, either the *de jure* or *de facto* tests may be used to determine whether a particular conflict is "in time of war" within the meaning of the Code's punitive articles, e.g., Article 90. *Bancroft.*

[3, 4] Since there have been only five declared wars since the founding of the Republic and none since the adoption of the UCMJ, *United States v. Anderson,* 38 C.M.R. 389 (1968) (Kilday, J., concurring), the question most frequently has been whether a particular conflict was a war in fact. The existence of a *de facto* war for these purposes is "determined by the realities of the situation as distinguished from legalistic niceties," and "the existence of armed hostilities against an organized enemy" is of crucial importance. *United States v. Shell,* 7 U.S.C.M.A. 646, 23 C.M.R. 110, 114 (1957) (Korean armistice terminated "time of war" and the statute of limitations was no longer suspended). The practical considerations which bear upon the determination of whether a conflict is "in time of war" for purposes of the Code include but are not limited to: the nature of the conflict; the manner in which it is carried on; the movement to and presence of large numbers of personnel on the battlefield; the casualties involved; the sacrifices required; the drafting of recruits to maintain a large number of personnel in the military service; national emergency legislation enacted and being enacted; executive orders promulgated; and the expenditure of large sums to maintain armed forces in the theater of operations. *Bancroft,* 11 C.M.R. at 5. Judicial notice may be taken of those factors present for a specific conflict. *Id.;* Mil.R.Evid. 201.

Applying the *de facto* war test, military courts have found the Korean and Vietnam Wars both qualified as "time of war" for various purposes of the Code. *Anderson* (Vietnam conflict was "in time of war" and therefore statute of limitations on unauthorized absence during conflict was suspended); *United States v. Sanders,* 7 U.S.C.M.A. 21, 21 C.M.R. 147 (1956) (though Korean conflict was "in time of war," special court-martial had jurisdiction to try Article 113 offense of sleeping on post because Korean war had ended); *United States v. Anderten,* 4 U.S.C.M.A. 354, 15 C.M.R. 354 (1954) (desertion during Korean conflict was "in time of war" and was a capital offense); *United States v. Taylor,* 4 U.S.C.M.A. 232, 15 C.M.R. 232 (1954) (Korean conflict was "in time of war" and therefore statute of limitations on Article 83 offense of fraudulent enlistment during conflict was suspended); *United States v. Ayers,* 4 U.S.C.M.A. 220, 15 C.M.R. 220 (1954) (Korean conflict was "in time of war" and therefore statute of limitations on unauthorized absence during conflict was suspended); *United States v. Christensen,* 4 U.S.C.M.A. 22, 15 C.M.R. 22 (1954) (Article 90 offense of willful disobedience of superior commissioned officer was a capital offense during Korean conflict); *Gann* (a deposition could not be admitted as to Article 90 offense during Korean conflict because offense was committed "in time of war" and was a capital offense); *Bancroft* (special court-martial lacked jurisdiction to try Article 113 offense of sleeping on post during Korean conflict because conflict was "in time of war" and offense was a capital offense); *United States v. Robertson,* 1 M.J. 934

(N.C.M.R.1976) (Korean conflict was "in time of war" and therefore statute of limitations on unauthorized absence during conflict was suspended); *United States v. Marchuk*, 11 C.M.R. 867 (A.F.B.R.1953) (special court-martial lacked jurisdiction to try Article 90 offense committed during Korean conflict because offense occurred "in time of war" and was a capital offense). Was the Gulf conflict either a *de jure* or a *de facto* war, thus qualifying the period of its duration as a "time of war" for purposes of the punitive articles of the Code?

■ Congress may assent to the waging of war by means other than a formal declaration of war, and what form it chooses to record that assent is within its discretion to decide. *Mitchell v. Laird*, 488 F.2d 611, 615 (D.C.Cir.1973). For our purposes, however, that choice has a bearing upon how we resolve the question of whether the Persian Gulf conflict was "in time of war" for purposes of the UCMJ. If Congress formally declared war on Iraq, the matter is resolved.

We have found no formal declaration of war by Congress against Iraq. On 12 January 1991, however, Congress adopted the "Authorization for Use of Force Against Iraq Resolution." H.J.Res. 77, Pub.L. 102–1, 105 Stat. 3 (1991) (to be reprinted in 50 U.S.C. § 1541 note). We are mindful that there was some discussion at the time of its adoption whether the January 12th resolution, itself, constituted a declaration of war.[5] However, that resolution is not styled a declaration of war and does not appear to be so when its language is compared with the formal declarations of war employed in the five other declared wars.[6] In any case, Congress did not leave us to speculate as to the resolution's character.

Section 2 of the January 12th resolution authorized the President to use the United States Armed Forces to achieve implementation of United Nations Security Council resolutions calling for Iraq's immediate and unconditional withdrawal from Kuwait. Section 2(c) of the January 12th resolution states that the authority granted the President is "specific statutory authorization within the meaning of section 5(b) of the War Powers Resolution."[7] The War Powers Resolution was adopted in 1973 over presidential veto and has itself been the subject of constitutional and political debate. While those debates are not a concern of this Court, Congress' explicit reference to the War Powers Resolution is illuminating for our purposes here.

In Section 2(c) of the War Powers Resolution, Congress states that the President as Commander-in-Chief has the constitutional power to introduce United States Armed Forces into hostilities or into situations where hostilities are clearly imminent only pursuant to (1) a declaration of war, (2) specific statutory authorization, or (3) a national emergency created by an attack on the United States. 50 U.S.C. § 1541(c). Section 4 of the War Powers Resolution obliges the President, *in the absence of a declaration of war*, to report to Congress within 48 hours when United States Armed Forces are introduced into hostilities or a situation where hostilities are imminent. 50 U.S.C. § 1543. With exceptions not pertinent here, Section 5(b) of the War Powers Resolution obliges the President to terminate the use of United States Armed Forces within 60 days of the report unless Congress declares war or unless it has enacted a "specific authorization for the use of United States Armed Forces." 50 U.S.C. § 1544(b). Reiterating, the Gulf authorization explicitly refers to § 5(b) of the

**5.** 137 Cong.Rec. H443–45 (daily ed. Jan. 12, 1991) (statement of Rep. Fascell); Letter from David M. Ackerman, Legislative Attorney, American Law Division, Congressional Research Service, Library of Congress (Jan. 10, 1991) to House Committee on Foreign Affairs, *reprinted in* 137 Cong.Rec. H446 (daily ed. Jan. 12, 1991).

**6.** 2 Stat. 755 (1812) (War of 1812, June 18, 1812); 9 Stat. 9 (1846) (Mexican War, May 13, 1846); 30 Stat. 364 (1898) (Spanish–American

War, April 25, 1898); 40 Stat. 1 (1917) (World War I, April 6, 1917); 55 Stat. 795, 796, 797 (World War II, Dec. 8 & 11, 1941); *Anderson*, 38 C.M.R. at 389–90 (Kilday, J., concurring); *see also* Congressional Research Service, Iraq–Kuwait: Issues Concerning a U.S. Declaration of War app. A–C (1990).

**7.** H.J.Res. 542, Pub.L. 93–148, § 5(b), 87 Stat. 555 (1973) (codified at 50 U.S.C. §§ 1541–1548).

War Powers Resolution and states the authority to use United States Armed Forces *is* "specific statutory authorization within the meaning of section 5(b) of the War Powers Resolution." By explicitly characterizing the January 12th authorization as a statutory authorization under the War Powers Resolution, Congress very clearly signalled the authorization was *not* a declaration of war. We concluded, then, that the January 12th resolution was not a formal declaration of war for purposes of the UCMJ. *See also Averette*, 41 C.M.R. at 365–66 (Vietnam conflict lacked formal declaration of war); *United States v. Anderson*, 17 U.S.C.M.A. 588, 38 C.M.R. 386, 391–92 (Kilday, J., concurring) (Tonkin Gulf resolution authorizing the use of force in the Vietnam conflict was not a declaration of war). Finding no formal declaration of war, we must consider whether the Gulf conflict was nonetheless a war in fact and therefore the period of its duration still constituted "time of war" for purposes of the Code.

With events of the Gulf conflict fresh in our own minds we might be tempted to render a summary conclusion. Nonetheless, the merit of our conclusion may only be judged, particularly in the years to come, if we set out at least a brief description of this conflict and apply to it the criteria noted above. The history of the Persian Gulf conflict is summarized as follows:

On August 2, 1990, the Iraqi Army, reputedly the fourth largest in the world, without provocation, invaded and occupied its neighbor, Kuwait. The same day, the U.N. Security Council adopted Resolution 660, condemning the invasion and demanding an immediate and unconditional withdrawal. A series of other Security Council resolutions followed, calling for an international trade embargo and financial sanctions upon Iraq. The President issued executive orders blocking Iraqi government property and prohibiting transactions with Iraq. On August 8, the President ordered the U.S. Armed Forces to Saudi Arabia. Over the next five and one-half months, the United States, together with a coalition of 32

nations under the aegis of "Operation Desert Shield" and "Operation Desert Storm," fielded in theater an armed force of 725,000 personnel, 2,600 aircraft, 1,900 helicopters, 3,000 tanks, 3,600 Armored Personnel Carriers (APCs), 1,100 artillery pieces, and 110 combatant ships, including 2 battleships and six aircraft carriers. Two hundred forty ships carried more than 18.3 billion pounds of equipment and supplies to sustain the force. A multinational naval force enforced the trade embargo by boarding 1,200 vessels and diverting 67 ships with prohibited cargo. The President authorized the activation of 1,000,000 reservists, and over 200,000 reservists (47,000 Navy and Marine Corps) were actually recalled to active duty. On 29 November 1990, the U.N. Security Council issued Iraq an ultimatum and authorized member states to use all means necessary to uphold the Council's previous resolutions calling for Iraq's withdrawal from Kuwait unless Iraq complied on or before 15 January 1991. On 12 January 1991, Congress authorized the President to use United States Armed Forces to achieve Iraq's compliance with U.N. Security Council Resolutions, provided the President's made available to Congress his determination that the United States had used all diplomatic and other peaceful means to achieve Iraq's compliance and that such means had not been and would not be successful. The President transmitted such a determination to Congress on 17 January 1991. That evening, allied coalition forces commenced a 42-day air campaign over Iraq and Kuwait. Iraq responded with surface-to-surface missile (SCUD) attacks upon Saudi Arabia and Israel. In the course of the air campaign, over 110,000 sorties were flown by coalition air forces against Iraqi bases, weapons plants, refineries, command and control centers, missile launchers, tanks and regulars. The conflict also marked the first time in history high-tech weapons of war, such as cruise missiles and anti-missile missiles, were employed in battle. Both the President and the Secretary of Defense declared the Persian

Gulf region a combat zone for various pay and tax purposes. On 23 February 1991, the allied coalition forces invaded Iraq and Kuwait. When Iraqi forces retreated, they set fire to 500 oil wells and left Kuwaiti museums, libraries and other buildings destroyed or damaged. They also left behind grim accounts of atrocities. By 27 February 1991, one hundred hours after the commencement of the ground assault, Iraq was defeated and Kuwait liberated. A temporary cease fire was declared the following day. On 6 March 1991, the President addressed a joint session of Congress and stated, "Five short weeks ago, I came to this House to speak to you about the State of the Union. We met then in time of war. Tonight, we meet in a world blessed by the promise of peace." On 6 April 1991, Iraq accepted terms of formal cease fire and on 11 April 1991, the U.N. Security Council declared a formal cease fire ending the Persian Gulf War. As a result of the conflict, Iraq lost or suffered damage to 4,000 tanks, 1,900 APCs, 2,100 artillery pieces, 100 aircraft, 7 helicopters and 100 vessels.

At the time of the conflict Iraqi forces in theater were estimated at 545,000 troops. In human terms, Iraq suffered 80,000 to 100,000 killed in action, and more than 80,000 Iraqis surrendered. Coalition forces lost or suffered damage to 4 tanks, 1 artillery piece, 44 aircraft, 17 helicopters and 2 ships. The war cost the coalition partners $40–50 billion. American casualties included 139 killed in action, 357 wounded in action and 6 missing in action.[8]

In sum, this conflict required the movement of very large numbers of personnel and materials to the field of battle and involved the use of the most powerful instruments of conventional warfare. Recruits were not drafted, however, the recall of large numbers of reserves was required to maintain a large number of personnel in the military service. National emergency legislation was enacted and emergency, wartime executive orders were promulgated. Substantial sums were expended to maintain armed forces in the theater of operations. Most significantly, tremendous casualties and sacrifices were suffered. It is patently obvious this conflict was a war

8. *E.g.*, H.J.Res. 77, Pub.L. 102–1, 105 Stat. 3 (1991); Exec.Order No. 12722, 3 C.F.R. 294 (1991) (blocking Iraqi Government Property and prohibiting transactions with Iraq); Exec.Order No. 12723, 3 C.F.R. 296 (1991) (blocking Kuwaiti Government property); Exec.Order No. 12724, 3 C.F.R. 297 (1991) (blocking Iraqi Government property and prohibiting transactions with Iraq); Exec.Order No. 12725, 3 C.F.R. 299 (1991) (blocking Kuwaiti Government property and prohibiting transactions with Kuwait); Exec.Order No. 12727, 3 C.F.R. 302 (1991) (ordering the selective reserve of the armed forces to active duty); Exec.Order No. 12728, 3 C.F.R. 302 (1991) (delegating the President's authority to suspend laws relating to promotion, retirement, and separation of members of the armed forces); Exec.Order No. 12733, 3 C.F.R. 311 (1991) (authorizing the extension of the period of active duty of personnel of the selective reserve of the armed forces); Exec.Order 12734, 3 C.F.R. 312 (1991) (national emergency construction authority); Exec.Order No. 12742, 56 Fed.Reg. 1079 (1991) (national security industrial responsiveness); Exec.Order No. 12743, 56 Fed.Reg. 2661 (1991) (ordering the ready reserve of the armed forces to active duty); Exec.Order No. 12744, 56 Fed.Reg. 2663 (1991) (designating the Arabian peninsula and adjacent areas as a combat zone for federal income tax purposes); Exec.Order No. 12750, 56 Fed.Reg. 6785 (1991) (designating the Arabian peninsula and adjacent areas as a combat zone for federal income tax purposes); President's letter to the President *Pro Tempore* of the Senate (January 16, 1991), 137 Cong.Rec. § 973 (daily ed. Jan. 17, 1991) (submitting President's determination pursuant to H.J.Res. 77, Pub.L. 102–1); President's State of the Union Address to Congress (Jan. 29, 1991), 137 Cong.Rec. H777 (daily ed. Jan. 29, 1991); President's Address to Congress (Mar. 6, 1991), 137 Cong.Rec. H1451 (daily ed. Mar. 6, 1991); Office of the Secretary of Defense memo, 17 Sept 1990 (designating Iraq and adjacent areas for special pay) *cited in* Dep't of Defense, Military Pay and Allowances Entitlements Manual (9 Mar 1987 & chg. 24, 12 Feb 1991), Attachment 3, bibliography [hereinafter DODPM]; Secretary of Defense memo, 19 Sept 1990 (designating the Arabian peninsula and adjacent areas for special pay) *cited in* DODPM, Attachment 3, bibliography; Office of the Chief of Naval Operations, The United States Navy in "Desert Shield/Desert Storm" (1991); 137 Cong. Rec. H433, 445 (daily ed. Jan. 12, 1991) (statement of Rep. Fascell); United States General Accounting Office, Operation Desert Shield/ Storm: Use of Navy and Marine Corps Reserves (1991); U.S. News and World Report, Jan 28, 1991 & Mar 11, 1991 (numerous articles); Newsweek, Jan 28, 1991 (numerous articles).

in fact, hence a "time of war" for purposes of the UCMJ.[9] Having concluded the Gulf conflict *qualified* as "time of war" for purposes of the Code, we must still answer the question whether capital punishment *was authorized* for an Article 90 violation committed during it.

■ Articles 18 and 56, UCMJ, 10 U.S.C. §§ 818, 856, authorize the President to establish maximum punishments for offenses under the Code. An offense under the Code, such as an Article 90 violation, is a capital offense if both the Code and the President authorize the death penalty for it. *Bancroft*, 11 C.M.R. at 5; *United States v. Greco*, 36 C.M.R. 559 (A.B.R. 1965); R.C.M. 103(3), 1003(b)(11), 1004(a). *Cf. Sanders*, 21 C.M.R. at 148; *Gann*, 11 C.M.R. at 13; *United States v. Franks*, 10 C.M.R. 634 (A.F.B.R.1953). As noted earlier, Article 90 authorizes the imposition of the death penalty "in time of war" and the Gulf conflict qualified as "time of war" for purposes of Article 90. MCM, Part IV, ¶ 14(e)(3), which is promulgated by Presidential executive order, also provides the death penalty is authorized for an Article 90 violation "in time of war." The President, however, has restricted the term "time of war" to mean "a period of war declared by Congress *or* the factual determination by the President that the existence of hostilities warrants a finding that a 'time of war' exists for purposes of R.C.M. 1004(c)(6) [aggravating factors required for death sentence] and Part IV ... of this Manual [the punitive articles, including Article 90]." R.C.M. 103(19) (emphasis and brackets added). We reiterate there was no formal declaration of war upon Iraq. We have also been cited no formal determination by the President that the Gulf conflict constituted a "time of war" for purposes of Part IV of the Manual. In the absence of a formal declaration of war or a determination by the President that the Gulf conflict constituted a "time of war" for purposes of MCM, Part IV, capital punishment was not authorized for a violation of Article 90. Accordingly, a special court-

martial had jurisdiction to try an alleged violation of Article 90 during the Gulf conflict without the concurrence of a general court-martial convening authority.

Our conclusions here are consistent with precedent under previous wars and editions of the Manual. In *Bancroft* the Court of Military Appeals concluded that the death penalty could be imposed for sleeping on post in time of war in violation of Article 113, UCMJ, 10 U.S.C. § 913, because the Korean conflict was "in time of war" within the meaning of that article. Like the appellant, Bancroft had been tried by special court-martial without the affirmative concurrence of the officer exercising general court-martial jurisdiction. In that instance, however, the President had authorized capital punishment for this offense by affirmatively removing sentencing limitations he had imposed under MCM, ¶ 127c, 1951. Thus, the *Bancroft* Court was not concerned with whether the President had authorized the death penalty, as we are. Rather, it was concerned solely with the more fundamental issue of whether the Korean conflict constituted a "time of war" within the meaning of the authorizing statute. In *Greco* the Army Board of Review concluded that the Vietnam conflict was a "time of war" for purposes of the Code, however, since the President had not authorized capital punishment for sleeping on post during that conflict, the offense was not a capital offense, and a special court-martial had jurisdiction to try it without the concurrence of a general court-martial convening authority.

Appellant's case is the same as Greco's. The conflict is different, but it, too, would qualify as a "time of war" within the meaning of the punitive articles. The mechanism for Presidential authorization has been modified only slightly. A table of maximum punishments no longer exists, and the President's limitations on punishments are set out in various places in Part IV of MCM, 1984. As noted, the President has further restricted the imposition of capital punishment for those offenses carrying

9. We reject the Government's contention that the Persian Gulf conflict was not a "time of war" because of the lack of "an enemy fighting back." Government Brief at 5.

the death penalty only "in time of war" by defining "time of war" to mean a period of war declared by Congress or a period of hostilities determined by the President to constitute a time of war for this purpose. R.C.M. 103(19). Here, neither a formal declaration of war, nor the required Presidential determination under R.C.M. 103(19) has been made. We reiterate, then, that the Gulf conflict qualified as a "time of war" within the meaning of the Code, however, without a declaration of war by Congress or a factual determination by the President that these hostilities constituted a "time of war" for purposes of Article 90, an Article 90 offense was not a capital offense, and the appellant's court-martial had jurisdiction to try him without the consent of the general court-martial convening authority.

The appellant also complains that the convening authority did not give him the benefit of his pretrial agreement to suspend all confinement in excess of 90 days. We agree the convening authority's action fails to suspend confinement in excess of 90 days and instead, almost 5 months after trial, purports to suspend all unexecuted confinement. We note from the record, however, the appellant served no confinement, and therefore received more than the benefit of his bargain. Staff Judge Advocate's Recommendation of 22 March 1991, ¶ 1g. We will correct the technical inaccuracy in the convening authority's action in our decretal paragraph.

The balance of the assignments of error are without merit and do not warrant comment. *United States v. Lowry*, 33 M.J. 1035 (N.M.C.M.R.1991).

The findings are affirmed. Only so much of the sentence as provides for confinement for a period of 90 days, forfeiture of $250.00 pay per month for a period of five months, reduction to pay grade E–1, and a bad-conduct discharge is affirmed.

Senior Judge FREYER and Judge HOLDER concur.