# UNITED STATES NAVY–MARINE CORPS COURT OF CRIMINAL APPEALS

————————————

## No. 201700175

————————————

## UNITED STATES OF AMERICA
Appellee

v.

## JASON R. HUTFLESS
Private First Class (E-2), U.S. Marine Corps
Appellant

————————————

Military Judge: Major M.D. Sameit, USMC.
Convening Authority: Commanding Officer, Headquarters and
Support Battalion, Marine Corps Installations West-Marine Corps
Base, Camp Pendleton, CA.
For Appellant: Commander Suzanne M. Lachelier, JAGC, USN;
Lieutenant Commander Derek C. Hampton, JAGC, USN.
For Appellee: Lieutenant George R. Lewis, JAGC, USN; Captain
Sean M. Monks, USMC

————————————

Decided 12 July 2018

————————————

Before WOODARD, MARKS, and JONES, *Appellate Military Judges*

————————————

**This opinion does not serve as binding precedent but may be cited as
persuasive authority under NMCCA Rule of Practice and Procedure
18.2.**

————————————

WOODARD, Chief Judge:

A military judge sitting as a special court-martial convicted the appellant,
contrary to his pleas, of one specification of unauthorized absence (UA) and
one specification of missing movement through design, in violation of Articles
86 and 87, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 886 and
887. The military judge sentenced the appellant to 11 months' confinement
and a bad-conduct discharge. The convening authority approved the adjudged
sentence and, except for the bad-conduct discharge, ordered it executed.

Although not raised by the parties, we find that the military judge erred when he terminated the appellant's UA on 10 June 2008. For this error, we grant relief and reassess the sentence. In his sole assignment of error, the appellant alleges that his convictions are barred by the statute of limitations. We disagree.

## I. BACKGROUND

### A. 18 May 2004 to 31 January 2017

*1. Appellant's unauthorized absence and missing movement*

The appellant reported to 1st Battalion, 7th Marine Regiment, 1st Marine Division, Twentynine Palms, California, on 8 April 2004. On 17 May 2004, he was not present for his post-liberty muster. Sometime during the previous weekend, the appellant left Twentynine Palms and went home to Nebraska. On 18 May 2004, the appellant's command placed him in a UA status. A month later, his command submitted a Deserter/Absentee DD Form 553, the report of a Deserter/Absentee Wanted by the Armed Forces.[1] On 25 August 2004, the appellant missed his unit's movement to Iraq.

*2. The "H-U-F-T-L-E-S-S" administrative error*

During the initial recording and reporting of the appellant's UA status, his unit administrative officer misspelled the appellant's name on the unit's legal report, transposing the "T" and "F" in the appellant's last name.[2] The same spelling error was made on the DD Form 553.[3] The form was forwarded to the Marine Corps Absentee Collection Unit who entered the appellant's misspelled name into the National Crime Information Center (NCIC) database. No one, including the appellant, knew of the error and, as a result, the appellant's misspelled name remained in the database for almost 13 years.

*3. The appellant's speeding tickets and arrests in 2004, 2005, 2006, and 2008*

In 2004, within a few months of entering into a UA status, the Sarpy County, Nebraska civilian authorities stopped the appellant for speeding. Fearful that he would be arrested, he did not disclose his UA status to the

---

[1] A DD Form 553 is  the mechanism used by the military to notify local, state, and federal law enforcement of the military member's unauthorized absentee status and its formal request to civilian law enforcement that the absentee be apprehended on behalf of the military.

[2] Prosecution Exhibit (PE) 7 at 1; Record at 33.

[3] PE 4 at 1.

citing officer. The following year, he was stopped for speeding again, this time in Omaha, Nebraska. When the officer ran the appellant's correctly spelled name through multiple state and federal databases, including the NCIC, an outstanding arrest warrant for failing to pay the fine for his 2004 speeding ticket appeared. The appellant was turned over to Sarpy County authorities who again ran the appellant's correctly spelled name through NCIC. The only outstanding arrest warrant was for the unpaid speeding fines. Thinking he "was already good"[4] since he had not been arrested for UA when previously stopped for speeding in 2004, the appellant did not disclose his UA status to the authorities. The appellant was also arrested in either 2006[5] or 2007[6] for matters not discussed on the record. Again, a records check using his correctly spelled name returned no active warrants for his arrest or apprehension.

Two years later, the appellant was again arrested in Omaha, this time for driving under the influence (DUI). He spent seven days in the county jail following this arrest. At some point during his confinement, the appellant asked a guard "to check–see if [he] was still [UA]" because the appellant wanted to "make sure that [he] was good."[7] The guard told the appellant that there was no warrant for his arrest for being UA[8] and that the Marine Corps "must have discharged [him]."[9] Other than the database check, the record is silent on whether there was any further action by the civilian authorities based upon the appellant's inquiry. It does not reflect whether the civilian authorities contacted the Marine Corps to verify the appellant's absentee status nor does it reflect whether the Marine Corps was notified that the appellant was available for return to military control. Apparently, after completing his civilian confinement, he was released without restrictions and allowed to resumed his normal activities.

*4. Discovery of the spelling error and the appellant's arrest for UA*

On 12 January 2017, almost 13 years after the appellant left his unit, a Marine Corps representative contacted the Douglas County Sheriff's Department and requested assistance in locating and apprehending the

---

[4] Record at 96.

[5] *Id.* at 102.

[6] *Id.* at 95.

[7] *Id.* at 97.

[8] *Id.* at 98.

[9] *Id.* at 105.

appellant.[10] A department official searched NCIC and the local and state databases for the appellant's name, using the correct spelling of H-U-T-F-L-E-S-S. Although, the appellant's name was in both NCIC and several of the local and state databases as a result of his multiple previous civilian offenses, there were no outstanding warrants for his apprehension—including for UA. However, the official conducting the database queries did find an NCIC entry for an active UA apprehension warrant with a similarly spelled name—H-U-F-T-L-E-S-S. After comparing the dates of birth and social security numbers on the two similarly spelled NCIC entries, the authorities determined the misspelled entry was for the appellant. Having discovered that the appellant's name was misspelled in the NCIC entry linked to his UA status, the UA entry in NCIC was corrected on 30 January 2017. The following day, the Douglas County Sherriff's Department, acting on behalf of the military authorities, located and apprehended the appellant. On 3 February 2017, the appellant was taken into military custody when cross-country chasers picked him up from the Douglas County law enforcement officials.

## B. The appellant's special court-martial

As discussed *supra*, the appellant was charged with one specification each of violating Articles 86 and 87, UCMJ. He entered pleas of not guilty to the charged offenses and elected to be tried by the military judge. The appellant focused his defense on duress, claiming that he left his unit because he was being hazed and mistreated by members of his command.

During his deliberations on the findings, the military judge requested clarification as to the date of the appellant's 2008 DUI arrest. The parties stipulated that it occurred on 10 June 2008. Without further comment, the military judge announced his findings, finding the appellant guilty of violating Article 86, UCMJ, by exceptions and substitutions. In announcing his findings, the military judge excepted the words "he was apprehended on or about 31 January 2017" and substituted therefor the words "on or about [10 June 2008]."[11] The military judge also found the appellant guilty of the Article 87, UCMJ, offense as charged.

---

[10] The appellant's home of record listed in the DD Form 553 was Omaha, Nebraska, which is located in Douglas County.

[11] Record at 126. The specification alleged: "[i]n that Private First Class Jason R. Hutfless, U.S. Marine Corps, on active duty, did, on or about 18 May 2004, without authority, absent himself from his unit, to wit: 1st Battalion, 7th Marine Regiment, 1st Marine Division[,] located at or near Marine Corps Air Ground Combat Center, Twentynine Palms, California[,] and did so remain absent until he was apprehended on or about 31 January 2017." Charge Sheet at 1.

## II. DISCUSSION

### A. Legal and factual correctness of the UA termination date

Although not raised by the parties, we question whether we can approve the termination date of the appellant's period of UA as legally and factually correct. We can only approve the military judge's findings regarding the date of termination and sentence if we are convinced, on the basis of the record, that they are correct in law and fact. Art. 66(c), UCMJ. Based upon the record before us, we conclude that the military judge's determination that the appellant's period of UA terminated by surrender on 10 June 2008 is not correct in law or fact.

The offense of UA is an instantaneous offense and is complete as soon as the accused absents himself without proper authority and the duration of his absence is a matter in aggravation for the purpose of increasing the maximum punishment authorized for the offense. *United States v. Lovell*, 22 C.M.R. 235, 237 (C.M.A. 1956); *see also* MANUAL FOR COURTS-MARTIAL, UNITED STATES (2002 ed.) (MCM), Part IV, ¶ 10.c.(8). Once a period of UA begins, it continues until terminated by the exercise of military control over the absentee. *United States v. Ringer*, 14 M.J. 979, 981-82 (N.M.C.M.R. 1982). The return to military control can be either actual or constructive. *United States v. Pettis*, 12 M.J. 616, 618 (N.M.C.M.R. 1981). As the appellant did not return to actual military control until 3 February 2017—when he was delivered into the custody of the military cross-country chasers by the Douglas County law enforcement officials—we will only address constructive control.

An absentee may be constructively returned to military control by several different methods. He is constructively returned to military control "when [the] absentee presents himself to military authorities with full intention of returning to duty, even when no control is exercised by military authorities." *Id.* (citation and internal quotation marks omitted). Additionally, an absentee may be constructively returned to military control when he is taken into custody by civilian authorities at the request of the military, or, when taken into custody by civilian authorities on civilian offenses, discloses his absentee status to civilian authorities and the civilian authorities notify the military of his immediate availability to be taken into their custody. *United States v. Lanphear*, 49 C.M.R. 742, 744 (C.M.A. 1975). Inherent in all manner of constructive control is that the military has been informed of its opportunity to exercise control over the absentee. If, after having been properly informed of its opportunity to exercise control over the absentee, the military fails or refuses to exercise control, constructive control will be deemed to have occurred and the UA terminated. *Id.*

The record establishes that the appellant's period of UA initiated and was completed on 18 May 2004, when he left his unit without proper authority.[12] In performing our Article 66(c), UCMJ, responsibility to determine the legal and factual correctness of the military judge's findings regarding the termination of the appellant's period of UA, the question then becomes, when and how did his UA terminate?

The military judge found that the appellant's period of UA terminated by surrender on 10 June 2008. Counsel did not request, and the military judge did not make special findings, concerning how the he arrived at the termination date for the appellant's UA. Our review of the record suggests that the military judge's findings were greatly influenced by the testimonial evidence presented by the appellant and the argument presented by trial defense counsel that the appellant developed an honest and reasonable, although mistaken, belief that he had somehow been discharged from the Marine Corps after initially absenting himself from his unit on 18 May 2004.[13] The date of 10 June 2008 may have been significant to the military judge as it was the date the appellant was arrested for DUI. It was also the first time, as the appellant testified, that he had notified civilian law enforcement of his "possible" UA status.[14] The extent of the appellant's notification to civilian law enforcement officials that he may be in a UA status was his asking the civilian guard "to check [to] see if [he] was still [UA]."[15]

### 1. Termination of UA in accordance with Article 86(c)(10), UCMJ

Article 86(c)(10), UCMJ, provides the five methods by which an absentee's UA can be terminated: (1) the absentee surrenders to military authority by presenting themselves to any military authority, notifies that authority of their UA status, and submits or demonstrates a willingness to submit to military control; (2) the absentee is apprehended by military authorities; (3) the absentee is delivered by anyone to military authorities; (4) the absentee is apprehended by civilian authorities at the request of military authorities; or (5) if the absentee is in the hands of civilian authorities for reasons other than a prior military request, the civilian authorities make the absentee

---

[12] In response to questioning by the court, the appellant indicated that he had no reason to doubt that he left his unit on 18 May 2004. Record at 113.

[13] *See id*. at 87-88, 96-99, 104-08, 118-19, and 122.

[14] *Id*. at 96.

[15] *Id*. at 97.

available for return to military control, and the military authorities are informed of the absentee's availability for return to their control.

The record is devoid of evidence of any action by the appellant, the military, or the Douglas County authorities on 10 June 2008 that would permit us to affirm a finding that the appellant's UA was terminated by one of the five means articulated in Article 86(c)(10), UCMJ. There is no evidence in the record that the appellant's UA terminated by surrender. He did not submit to, or demonstrate a willingness to submit to, military control. There is no evidence in the record that the appellant was delivered to military control by anyone. Furthermore, although the appellant was in the hands of the Douglas County civilian authorities for other reasons (his DUI arrest), there is no evidence in the record that the Douglas County authorities were aware that the military had requested the appellant's apprehension, that they made the appellant available for return to military control, that they contacted the military to inform them of the appellant's availability for return to their control, or that the military was ever presented an opportunity to exercise control over the appellant.

The record fails to establish the facts necessary to find that on 10 June 2008, the appellant returned to military control—actually or constructively—and, therefore, his UA was not terminated by surrender, or by any other means of termination listed in Article 86(c)(10), UCMJ. The record does, however, establish that, after being released by the Douglas County authorities, the appellant apparently faded back into the civilian population and had no interaction with military, or civilian authorities on behalf of the military, until 31 January 2017—when he was arrested by the Douglas County authorities acting on behalf of the military based upon the corrected DD Form 553.

*2. Mistake of fact*

Having concluded that the appellant's UA did not terminate by any of the five means listed in Article 86(c)(10), UCMJ, we now turn to whether the appellant's UA could have terminated on 10 June 2008 under the theory of mistake of fact. We conclude that it did not.

UA is a general intent crime. *United States v. Holder*, 22 C.M.R. 3, 6 (C.M.A. 1956). It is an affirmative defense to the offense if the appellant had an honest and reasonable belief that he was not required to be at his unit at the time of his absence. *Id.* at 7. The evidence triggering the mistake of fact defense must show the accused's mistake was both honest and reasonable. *United States v. Hibbard*, 58 M.J. 71, 75 (C.A.A.F. 2003). Furthermore, to be reasonable, the mistake cannot be based on a negligent failure to discover the

true facts. "Negligence is the absence of due care. Due care is what a reasonable person would do under the same or similar circumstances."[16]

After leaving his unit on 18 May 2004, the appellant "never once sought to ascertain, *from anyone likely to know*, whether or not he had been discharged from [the Marine Corps]." *Holder*, 22 C.M.R. at 12 (emphasis added). An inquiry by any mode of communication to his unit, or a visit to any one of the three Marine Corps recruiting stations in Omaha, Nebraska,[17] would have likely provided him with the necessary information concerning his absentee status. Any belief the appellant may have had that his UA was terminated because he had somehow been discharged by the Marine Corps after leaving his unit without the proper authority on 18 May 2004 was unreasonable. We are convinced that the appellant's failure to take reasonable actions to determine the true facts concerning his military status renders any claim of mistake as to his military status defective. We conclude that the defense of mistake of fact was not raised and, therefore, could not terminate his absence on 10 June 2008.

Having concluded that the appellant's UA was not terminated on 10 June 2008 by any of the means listed in Article 86(c)(10), or by mistake of fact, we find that the military judge's finding that the appellant's UA was terminated by surrender on that date was error and that portion of his finding cannot be affirmed. Accordingly, if we are to affirm the appellant's UA conviction, we can only affirm a one-day UA that occurred on 18 May 2004. *Lovell*, 22 C.M.R. at 239; *see also* MCM, Part IV, ¶10(C)(8). ("If the duration [of the UA] is not alleged or if alleged but not proven, an accused can be convicted and punished for only [one] day of unauthorized absence.").

In order to determine whether we can affirm the appellant's offenses, we must first address the appellant's claim of error—that his convictions are barred by the statute of limitations of Article 43(b)(1), UCMJ.

## B. Are the convictions barred by the statute of limitations?

Like the offense of UA, missing movement is also an instantaneous offense and is committed the moment an accused misses the movement of his or her unit. *United States v. Dube*, No. 200000698, unpublished op., 2001 CCA LEXIS 5 at *4 (N-M. Ct. Crim. App. 16 Jan 2001). We previously

---

[16] Military Judges' Benchbook, Dept. of the Army Pamphlet 27-9 at 1010 (10 Sep 2014).

[17] Record at 75. During cross-examination, the appellant admitted that he had been to two of the three recruiting stations in Omaha, Nebraska. *Id*. at 105.

determined that if the appellant's UA conviction is to be affirmed, we could only affirm a one-day UA offense that occurred on 18 May 2004. The military judge convicted the appellant of missing movement through design on 25 August 2004. The appellant's sworn charges were received by the officer exercising summary court-martial jurisdiction over his command on 21 February 2017 (UA offense) and 6 March 2017 (missing movement offense).

Article 43(b)(1), UCMJ, provides that "[e]xcept as otherwise provided in this section (article), a person charged with an offense is not liable to be tried by court-martial if the offense was committed more than five years before receipt of sworn charges by an officer exercising summary court-martial jurisdiction over the command." However, "[p]eriods in which the accused is [UA] or fleeing from justice shall be excluded in computing the period of limitation prescribed in [Article 43(b)(1), UCMJ.]" Art. 43(c), UCMJ.

The appellant argues that because his UA terminated more than five years prior to the receipt of his sworn charges by the officer exercising summary court-martial jurisdiction for his command, the Article 43(b)(1), UCMJ, five-year statute of limitations on his offenses had expired. Thus his convictions are barred by the statute of limitations.[18] We disagree. We find the appellant went UA and missed movement "in time of war;" therefore, there was no statute of limitations applicable to his offenses. Art. 43(a), UCMJ.

*1. UA and missing movement in time of war*

Article 43(a), UCMJ, provides that "[a] person charged with [UA] or missing movement in time of war . . . may be tried and punished *at any time without limitation.*" (Emphasis added). What constitutes "time of war" within the context of Article 43(a), UCMJ, is not a novel question.

Military courts have used two tests to determine whether a period of military conflict qualifies as a "time of war." A period of conflict is a "time of war" if either "Congress formally declares war (*de jure* war test) or if the conflict is a war in fact (*de facto* war test)." *United States v. Castillo*, 34 M.J. 1160, 1163 (N.M.C.M.R. 1992) (citing *United States v. Gann*, 11 C.M.R. 12, 13 (C.M.A. 1953)); *see also United States v. Bancroft*, 11 C.M.R. 3 (C.M.A. 1953).

---

[18] Despite our findings that the military judge's determination that the appellant's UA terminated on 10 June 2008 was error and that if we are to affirm the UA conviction we could only affirm a one-day UA occurring on 18 May 2004, the basis of the appellant's claim of error would remain unchanged—the officer exercising summary court-martial jurisdiction did not receive the sworn charges in his case until after the five-year statute of limitations had run.

Recognizing that Congress has not formally declared war since the adoption of the UCMJ, we turn our attention to the *de facto* war test.

For the purposes of the UCMJ, the existence of a *de facto* war "is determined by the realities of the situation as distinguished from legalistic niceties, and the existence of armed hostilities against an organized enemy is of significant crucial importance." *Castillo*, 34 M.J. at 1163. (citation and internal quotation marks omitted). The practical considerations to be evaluated when determining whether a conflict is a *de facto* war include, but are not limited to:

> the nature of the conflict; the manner in which it is carried on; the movement to and presence of large numbers of personnel on the battlefield; the casualties involved; the sacrifices required; the drafting of recruits to maintain a large number of personnel in the military service; national emergency legislation enacted and being enacted; executive orders promulgated; and the expenditure of large sums to maintain armed forces in the theater of operations.

*Id*. (citing *Bancroft*, 11 C.M.R. at 5).

Since the implementation of the UCMJ, our superior court, this court, and our sister service courts of criminal appeals have found the Korean, Vietnam, and both Iraq conflicts (Operations DESERT SHIELD/DESERT STORM and IRAQI FREEDOM) were *de facto* wars. *See United States v. Anderson*, 38 C.M.R. 386, 387 (C.M.A. 1968) (Vietnam conflict); *United States v. Ayers*, 15 C.M.R. 220, 227 (C.M.A. 1954) (Korean conflict); *Bancroft*, 11 CMR at 5 (Korean conflict); *United States v. Rivaschivas*, 74 M.J. 758, 761 (A.C.C.A. 2015) (Operation IRAQI FREEDOM); *Castillo*, 34 M.J. at 1166-67 (Operation DESERT SHIELD/DESERT STORM). However, the appellant argues that, with respect to Operation IRAQI FREEDOM, the *Rivaschivas* holding addressed only whether the conflict was a "time of war" during 2007—more than three years after the appellant committed his offenses.[19]

As noted by the appellant, the *Rivaschivas* court did evaluate the conflict as it existed in 2007. *Rivaschivas,* 74 M.J. at 762. Regarding the state of the conflict in 2007, the *Ricaschicas* court noted:

> the continuous and multiple large-scale deployments to both Iraq and Afghanistan of combat units going back to 2003, the well-documented number of combat fatalities and injuries in that theater of operations during those campaigns, the

---

[19] Appellant's Brief of 2 Nov 2017 at 5.

> tremendous financial cost of our ongoing military conflicts in the Middle East, the various legislative enactments and executive orders detailing our wartime footing in Iraq and Afghanistan, the creation of military commissions with the purpose of prosecuting violations of the law of war, and judicial decisions such as *Hamdi v. Rumsfeld,* 542 U.S. 507, (2004).

*Id.*

Acknowledging that the *Rivaschivas* court's determination is persuasive but not binding precedent, and that the court focused on the state of the conflict in 2007 not 2004, we will apply the *Bancroft* factors to the conditions of the conflict in 2004—when the appellant committed his offenses. As our superior court did in *Bancroft,* we also rely on "[a] reading of the daily [media] accounts of the conflict in [Iraq]; an appreciation of the size of the forces involved; a recognition of the efforts, both military and civilian, being expended to maintain military operations in that area; and knowledge of other well-publicized wartime activities . . . ." *Bancroft,* 11 C.M.R. at 5-6.

### 2. Conditions of the conflict in 2004

In 2004, our military forces were conducting statutorily authorized combat operations in Iraq[20] and Afghanistan.[21] Approximately 130,600 military personnel were deployed to Iraq and the surrounding areas in support of the conflict.[22] Over 170,000 reservists and National Guard personnel were activated to augment the active duty force.[23] On the battlefields of Iraq and Afghanistan, our armed forces were utilizing the most advanced and powerful weapon systems in the world. The Department of Defense expended substantial funds to maintain armed forces in Iraq and

---

[20] *Authorization for Use of Military Force Against Iraq Resolution of 2002*, Pub. L. No. 107–243, 116 Stat. 1498.

[21] *Authorization for Use of Military Force*, Pub. L. No. 107-40, 115 Stat. 224 (2001).

[22] Amy Belasco, CONG. RESEARCH SERV., R40682, TROOP LEVELS IN THE AFGHAN AND IRAQ WARS, FY2001–FY2012: COST AND OTHER POTENTIAL ISSUES (2009) at 9 (citations omitted).

[23] Department of Defense, Defense Science Board Task Force, *Deployment of Members of the National Guard and Reserve in the Global War on Terrorism* (2007) at 7.

Afghanistan.[24] Our military forces in Iraq and Afghanistan suffered a combined 737 killed in action and another 8,221 wounded in action.[25]

Applying the *Bancroft* factors to the conditions of the conflict in 2004, we are easily convinced "beyond any reasonable doubt that we [were] in a highly developed state of war" in 2004 for Article 43, UCMJ, purposes. *Bancroft*, 11 C.M.R. at 6. Because the appellant was charged with UA and missing movement during this time of war, the five-year statute of limitations does not bar his convictions. We, therefore, affirm the appellant's convictions for a one-day UA on 18 May 2004 in violation of Article 86, UCMJ, and missing movement through design on 25 August 2004 in violation of Article 87, UCMJ.

**C. Sentence reassessment**

Having modified the findings of the court-martial, we must now consider whether we can reassess the sentence. *United States v. Winckelmann*, 73 M.J. 11, 15-16 (C.A.A.F. 2013); *United States v. Moffeit*, 63 M.J. 40, 41-42 (C.A.A.F. 2006); *United States v. Sales*, 22 M.J. 305, 307-08 (C.M.A. 1986). We can reassess a sentence without ordering a rehearing if we are confident "that, absent any error, the sentence adjudged would have been of at least a certain severity[.]" *Sales*, 22 M.J. at 308. A reassessed sentence must not only "be purged of prejudicial error [but] also must be appropriate for the offense involved." *Id.* (internal quotation marks omitted).

We base these determinations of appropriateness on the totality of the circumstances of each case, guided by the following "illustrative, but not dispositive, points of analysis":

(1) Whether there has been a dramatic change in the penalty landscape or exposure.

(2) Whether sentencing was by members or a military judge alone.

(3) Whether the nature of the remaining offenses captures the gravamen of criminal conduct included within the original offenses and whether

---

[24] The combined cost of supporting combat operations in Iraq and Afghanistan in 2004 was approximately $92,000,000,000. Amy Belasco, CONG. RESEARCH SERV., RL33110, THE COST OF IRAQ, AFGHANISTAN, AND OTHER GLOBAL WAR ON TERROR OPERATIONS SINCE 9/11 (2014) at 15.

[25] Department of Defense, Defense Casualty Analysis System, *Casualty Summary by Month and Service*, https://dcas.dmdc.osd.mil/dcas/pages/.xhtml, last visited: Jul. 5, 2018. By comparison, in 2007, United States military casualties included 847 killed in action and 6,872 wounded in action. *Id.*

significant or aggravating circumstances addressed at the court-martial remain admissible and relevant to the remaining offenses.

(4) Whether the remaining offenses are of the type with which appellate judges should have the experience and familiarity to reliably determine what sentence would have been imposed at trial.

*Winckelmann*, 73 M.J. at 15-16.

Under all the circumstances presented, we find that we can reassess the sentence and that it is appropriate for us to do so. First, there has not been a dramatic change in the penalty landscape. Considering the appellant was tried by special court-martial, our action in reducing the appellant's UA to a one-day offense did not change the penalty landscape. The appellant still faces the jurisdictional maximum for that forum.

Second, the appellant elected to be tried and sentenced by a military judge, and we are more likely to be certain of what sentence the military judge, as opposed to members, would have imposed.

Third, the gravamen of the conduct for which the appellant remains the same—the appellant went UA and he missed the movement of his unit to Iraq for a combat deployment. With the exception of the evidence regarding the duration of the UA presented during the merits phase of the court-martial, our action on the findings does not render inadmissible any evidence admitted in aggravation. The appellant's prior civilian convictions would still have been admissible under RULE FOR COURTS-MARTIAL 1001(B)(3), MCM.[26] The military judge limited the evidence presented in aggravation to the impact the appellant's missing movement had on his unit's available machine gunners—the appellant's military occupational specialty—while the unit was deployed to Iraq.

Last, these are offenses with which we, as appellate judges, have in depth experience and familiarity to reliably determine what sentence would have been imposed at trial. The evidence of the appellant's culpability and the impact of his misconduct on his unit's mission and efficiency remain the same. Taking these facts as a whole, we can confidently and reliably determine that, absent the error, the military judge would have imposed a sentence of at least 10 months' confinement and a bad-conduct discharge. We also conclude that the adjudged sentence is an appropriate punishment for

---

[26] PE 16 reflects the appellant's civilian convictions for: theft by taking (March 2008); driving under the influence (September 2008); and assault and battery (April 2016). PE 17 reflects the appellant's civilian conviction for attempted commission of a class 3A or 4 felony—possession of a controlled substance (October 2011).

the modified offenses and this offender—thus satisfying the *Sales* requirement that the reassessed sentence be not only purged of error, but also appropriate.

### III. CONCLUSION

The findings and sentence as modified are affirmed. The supplementary court-martial order will reflect affirmed findings of guilt to a one-day UA committed on 18 May 2004 and missing movement through design on 25 August 2004 with an affirmed sentence of 10 months' confinement and a bad-conduct discharge.

Senior Judge MARKS and Senior Judge JONES concur.

For the Court

R.H. TROIDL
Clerk of Court